**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| TERRELL ARMSTRONG, *on behalf of himself and all individuals similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>CREDIT CUBE, also known as CreditCube; BEN G. RAY, III; and NORTH AMERICAN BANKING COMPANY,<br><br>Defendants | Case No. 1:25-cv-916<br><br>**CLASS ACTION COMPLAINT<br>(Jury Trial Demanded)** |

## INTRODUCTION

Plaintiff Terrell Armstrong ("Plaintiff"), individually and on behalf of all individuals similarly situated, through counsel, brings this action to secure redress from predatory and unlawful loans. The loans are made in the name of Defendant Credit Cube d/b/a CreditCube, purportedly wholly owned and operated by the Big Valley Band of Pomo Indians of the Big Valley Rancheria ("the Tribe"). Defendant Ben G. Ray III is the CEO and tribal administrator of the Tribe and upon information and belief is a principal executive officer of Credit Cube. Other non-tribal parties involved in making the loans will be identified through discovery.[1]

## NATURE OF THE ACTION

1.      This case concerns the making and collection of unlawful loans by Credit Cube—a predatory tribal lending entity that is "a wholly owned and operated business of the Big Valley Band of Pomo Indians of the Big Valley Rancheria." These loans, which are for relatively small

---

[1] Unless identified individually herein, for convenience named and other unknown defendants are collectively referred to as "Credit Cube."

amounts of money and short terms, are saddled with triple-digit interest rates. Loans of this nature are unlawful in most states, including North Carolina, where Mr. Armstrong resides.

2.      The short-term, usurious loans provided by Credit Cube are designed to take advantage of vulnerable borrowers. Left unregulated, they create a cycle of mounting debt.

3.      Short-term lenders like Credit Cube attempt to circumvent states' legal protections to further their usurious business model by hiding behind a claim of tribal ownership that allegedly provides immunity from suit in "any court."

4.      In the "most recent incarnation of payday lending regulation-avoidance," lenders claim to be owned and operated by a Native American tribe to "gain the benefit of tribal sovereign immunity and avoid state usury laws, small loan regulations, and payday loan laws." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 WASH. & LEE L. REV. 751, 753 (2012). The connection between Native American tribes and internet payday lenders are frequently tenuous at best. *Id.* at 784–85.

5.      This scheme not only takes advantage of vulnerable borrowers; it also exploits Native American tribes.

6.      Plaintiff brings this class action on his own behalf, and on behalf of a class of all persons who obtained Credit Cube loans in North Carolina, to recover all amounts collected by Credit Cube and for damages, attorneys' fees, and such other relief as allowed by law. Plaintiff also seeks declaratory and injunctive relief including a declaration that the loans are void, an order that interest payments be refunded, and an order requiring correction of affected credit reports of class members.

7.      In this class action against Credit Cube, Mr. Armstrong alleges violations of North Carolina's Usury Statute N.C.G.S. § 24-1, *et seq.*; the North Carolina Consumer Finance Act N.C.G.S. § 53-164, *et seq.* ("CFA"); the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, *et seq.* ("NCUDTPA"); and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Credit Cube because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States as long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.,* 126 F.3d 617 (4th Cir. 1997). Because Credit Cube is a resident of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

10.     The Court also has personal jurisdiction over Credit Cube because they have conducted business in this District and Division.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in North Carolina, including in this District and Division, where some of the activities of the alleged RICO enterprise occurred.

12.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Credit Cube transacted its affairs in North Carolina through their participation in a conspiracy and a lending enterprise targeting North Carolina consumers. In the alternative, venue is proper in this

Court pursuant to 28 U.S.C. § 1391(b)(3) because Credit Cube resides in different states and there is no single district where this action could otherwise be brought.

**PARTIES**

13.      Mr. Armstrong is a natural person and a citizen and resident of North Carolina.

14.      At the time Mr. Armstrong entered into his loan agreement with Credit Cube online, he resided in North Carolina. *Loan Agreement*, attached hereto as **Exhibit A**.

15.      Credit Cube is an online lender that offers loans to consumers at annual percentage rates in excess of 700% via the website www.creditcube.com.

16.      Credit Cube claims to be a "tribal enterprise" and "wholly owned and operated by the Big Valley Band of Pomo Indians, a federally recognized American Indian tribe and sovereign government."[2]

---

[2] "The Big Valley Rancheria is located in Lake County, Northern California, on the shores of Clearlake. Big Valley Rancheria is located adjacent to the small, rural agricultural community of Lakeport, CA, approximately 2 hours from any metropolitan area. Lakeport, California has a staggering unemployment rate, high-school dropout rate, and wide-spread poverty. Big Valley is also located in the poorest County in California, Lake County. Big Valley Band of Pomo Indians has 1,020 total Tribal members, 590 of these members are under the age of 21 years and 774 are under the age of 24. . . . Big Valley Band of Pomo Indians Tribal Community is plagued with drug and alcohol addiction. During the SAMHSA 2014 community needs assessment the assessment approximated 70% of our community is in active and/or recovering from addiction of drugs, alcohol, and pharmaceuticals. Due to the community circumstances such as lack of healthy tribal community activities for ages up to 24, transportation to local actives/ programs/events, youth programs and un-healthy lifestyle choices among the community this has led to wide spread addiction in young children." SAMHSA, Award Description, Big Valley Band of Pomo Indians SAMHSA Grant, Award No. SM063514, https://taggs.hhs.gov/Detail/AwardDetail?arg_AwardNum=SM063514&arg_ProgOfficeCode=80 (last visited Oct. 2, 2025).

17.     Upon information and belief, Credit Cube was organized under the laws of Panama City, Panama.[3] However, the Tribe is headquartered in Lakeport, California. The tribal jurisdictional area is in Lake County, California.

18.     In fact, Credit Cube is the product of a "rent-a-tribe" scheme, in which non-Native American persons conduct business as a purported instrumentality of Native American tribes to evade state usury laws, paying a small percentage of the proceeds to the tribe.

19.     According to its website, Credit Cube directs mail correspondence to 2770 Mission Rancheria Rd. #180, Lakeport, CA 95453—a two-bedroom house with less than 1,200 square feet.[4]

20.     Credit Cube does not provide a home office address on its website. The Better Business Bureau has the address PO Box 133 Finley, CA 95435-0133 on file for Credit Cube.[5] Upon information and belief, this second address is a rented UPS Store mailbox.

21.     According to the Better Business Bureau's website, Credit Cube has an F rating for failure to respond to complaints filed against them.

22.     Defendant Ben G. Ray III may be found at 2726 Mission Rancheria Rd., Lakeport, CA 95453. Upon information and belief, he is an executive and officer of Credit Cube.

---

[3] Company Profile available at
https://tracxn.com/d/companies/creditcube/__T86UM6MRjWZ7T71QytKjVvoSF-RtrSiq-l8-UrVRMyU#about-the-company (last visited Oct. 2, 2025)

[4] This same address is or has been used by other rent-a-tribe schemes. Liberty Cash Lenders, Freedom Cash Lenders, Golden Gate Funding, Layma LLC d/b/a Little Lake Lending, Xomka LLC d/b/a Rushmore Credit, Kali LLC d/b/a Condor Credit, Kali LLC d/b/a Arrow Funding Group, and Green Arrow Loans all use this address on tribal land to claim sovereign immunity for their schemes. Big Valley Financial and Zen Resolve, LLC, both dissolved rent-a-tribe entities, used this address prior to dissolution.

[5] *Better Business Bureau* available at https://www.bbb.org/us/ca/finley/profile/loans/credit-cube-1116-881699

23.     Upon belief, payments to Credit Cube and other ACH transactions involving Credit Cube are handled by Defendant North American Banking Company, a state-chartered bank with principal offices at 2230 Albert St. N., Roseville, MN 55113.

24.     Upon belief, North American Banking Company processes payments and ACH transactions for Credit Cube.

## FACTUAL BACKGROUND

**A.     Credit Cube's Unlawful Loan to Plaintiff**

25.     On or about March 12, 2025, Credit Cube made a $400.00 loan to Mr. Armstrong (the "Loan"). **Exhibit A**.

26.     Mr. Armstrong applied for the Loan online through Credit Cube's website.

27.     On or about March 12, 2025, the Loan proceeds were transferred into Mr. Armstrong's bank account, which he maintained in North Carolina.

28.     Mr. Armstrong's first payment was due March 26, 2025.

29.     Upon belief, North American Banking Company processed the ACH transactions that were debited from his bank account.

30.     The Loan has a stated annual percentage rate of 755.68%. *Id.* The per annum interest rate on the Loan is approximately 379%.

31.     Even with timely payments, the total amount paid—over a four-month period, on a $400 Loan—would be $1,180.43. Mr. Armstrong's final payment was due—and made—on July 9, 2025. *Id.*

32.     On July 10, 2025, Credit Cube showed $69.25 as due and marked Mr. Armstrong's loan as past due.

33. Credit Cube emailed Mr. Armstrong a collections notice of "defaulted payment(s)" on July 15, 2025, and showed a balance of $70.77 due.

34. Credit Cube increased the balance on Mr. Armstrong's paid-off loan between July 10, 2025, and July 15, 2025.

**B. North American Banking Company's Role in the Unlawful Loan**

35. Upon belief, North American Banking Company receives and processes payments and ACH transactions for Credit Cube.

36. North American Banking Company is a member of the mainstream payments system (the "Automated Clearing House" or "ACH Network"). As an Originating Depository Financial Institution ("ODFI"), it acts as the gateway to the mainstream electronic payments system for Internet lenders like Credit Cube.

37. Rules and regulations that govern the ACH network are established by NACHA (formerly the National Automated Clearing House Association) and the Federal Reserve. NACHA manages the development, administration, and governance of the ACH Network.

38. The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States. These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

39. The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.

40. NACHA Rules require all ODFIs to conduct a risk assessment of their ACH activities, including assessing the nature of risks associated with ACH activity; performing appropriate know-your-customer due diligence; and having adequate management, information, and reporting systems to monitor and mitigate risk.

41.     Among other things, the ODFI is required to guard against debit entries from consumer accounts relating to illegal transactions. ODFIs have the right to audit transactions submitted through it.

42.     ODFIs have a duty to "know your customer."

43.     North American Banking Company is and has been used by multiple tribal lending operations. It is well aware of the illegality of tribal lending operations and that it is participating in the collection of unlawful debts. *See e.g. Parm et al v. BMO Harris Bank., N.A. North American Banking Company, et al.,* No. 1:13-cv-03326 (N.D. Ga. 2013).

**C.     North Carolina Usury Law**

44.     The terms of Mr. Armstrong's Loan must conform with the laws of the State of North Carolina because: (1) Mr. Armstrong acquired the Loan from Credit Cube from his home, located in North Carolina; (2) the proceeds were transferred to Mr. Armstrong's bank account in North Carolina; (3) funds were drafted via ACH from Mr. Armstrong's bank account in North Carolina; and (4) Mr. Armstrong received collection correspondence in North Carolina.

45.     The State of North Carolina has a history of limiting predatory lending and protecting vulnerable borrowers. "Interest is the premium allowed by law for the use of money, while usury is the taking of more for its use than the law allows. It is an illegal profit." *Yarborough v. Hughes,* 139 N.C. 199, 207, 51 S.E. 904, 907 (1905). "Usury statutes are designed to protect the borrower whose necessity and importunity may place him at a disadvantage with respect to the exactions of the lender [.]" *Mortgage Co. v. Zion Church,* 219 N.C. 395, 397 (1941) (quoting *Hill v. Lindsay,* 210 N.C. 694, 699 (1936)). "[F]or an unlicensed lender to charge a rate of interest on a small loan greater than the rates permitted is a violation both of the Consumer Finance Act, and

of Chapter 24's prohibitions on usury." *State ex rel. Cooper v. NCCS Loans, Inc.,* 174 N.C. App. 630, 634, 624 S.E.2d 371, 374 (2005).

46.     In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C.G.S. § 24-1.

47.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6% rounded to nearest half percent, or (2) 16%." N.C.G.S. § 24-1.1(c).

48.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C.G.S. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

49.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $25,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C.G.S. §§ 53-166(a), 53-168.

50.     Unlicensed venders who issue loans exceeding the maximum interest rate are guilty of a Class 1 Misdemeanor. N.C.G.S. § 53-166(c). Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* at § 53-166(d).

51.     Credit Cube was never licensed to make consumer loans in North Carolina.

52.     Credit Cube charged Mr. Armstrong 755.68% APR on his loan. This APR far exceeds the APR allowed by North Carolina usury law.

53.     Defendants' issuance and collection of the Loan to Mr. Armstrong constitutes a Class 1 Misdemeanor pursuant to N.C. Gen. Stat. § 53-166(c).

**D.      Rent-A-Tribe Schemes**

54.     The Big Valley Band of Pomo Indians of the Big Valley Rancheria is a federally recognized American Indian Tribe in California.

55.     Credit Cube's website claims it is a lending entity owned and operated by the Tribe.

56.     Yet, the only business enterprises which could be legitimately described as owned and operated by the Tribe are: the Konotcti Vista Casino, Big Valley Market & Fuel, Big Valley Rancheria Smoke Shop, and Mission Grown Medicinals.[6]

57.     The ties between the Tribe and Credit Cube are either illusory or functionally non-existent.

58.     According to press reports summarized in a Public Justice Report about a similar rent-a-tribe scheme, the tribe kept just 1% of the $100 million in revenue generated by MacFarlane Group—a partner brought in to assist with underwriting, software development, marketing, and call center support for two of the tribe's past online lender entities. Kyra Taylor, *Stretching the Envelope of Tribal Sovereign Immunity? An Investigation of the Relationships Between Online Payday Lenders and Native American Tribes*, THE PUBLIC JUSTICE FOUNDATION, p. 201 (Nov. 2017); *see id.* at 200–02 (describing the public information available at the time regarding the Otoe-Missouria Tribe and its involvement in payday lending).

59.     Tribal payday lending businesses can be operated legitimately. "In their most legitimate formation, TLEs [tribal lending entities] often maintain offices on tribal land, where they operate their servers and hire tribal members as employees in all stages of the lending

---

[6] Tribal Enterprises, *available at* https://www.bvrancheria.com/businesses (last visited Oct. 2, 2025)

enterprise. However, in many cases, the majority of TLE funding comes from third-party non-tribal entities, and this often results in lending businesses in which the non-tribal entity receives the bulk of the financial benefit." Brianne Marino Glass, *Tribal Lending Under CFPB Enforcement: Tribal Sovereign Immunity and the "True Lender" Distinction*, 23 N.C. BANKING INST. 401, 412 (2019).

60.    Online lenders and other similar entities use this "rent-a-tribe" scheme to avoid state usury laws by invoking the sovereign immunity available to Native American tribes.[7] In general, the scheme is premised on a simple exchange: non-tribal entities and individuals operate nearly all substantive aspects of the lending business, while the tribe is used as a label or a figurehead in exchange for a portion of the profits.

61.    Credit Cube preys on North Carolina consumers with the understanding that Credit Cube's business model will inevitably attract legal scrutiny. The inevitability of lawsuits are calculated into the "rent-a-tribe" business model; when lawsuits are filed, Ben G. Ray III closes shop with one online lender and starts another.

62.    In recent years, the Tribe, through Ben G. Ray III and other unknown defendants, have been affiliated with other online lenders, such as Liberty Cash Lenders, Freedom Cash Lenders, Golden Gate Funding, Layma LLC d/b/a Little Lake Lending, Xomka LLC d/b/a Rushmore Credit, Kali LLC d/b/a Condor Credit, Kali LLC d/b/a Arrow Funding Group, and Green Arrow Loans.

63.    Just because Credit Cube (and similar rent-a-tribe schemes) offers up a singular member of their tribe as a proverbial lamb to slaughter—while the true culprit hides in the shadows

---

[7] *Crossing State Lines: The Trojan Horse Invasion of Renat-a-Bank and Rent-a-Tribe Schemes in Modern Usury Law*, Jayne Munger, *available at* https://www.gwlr.org/wp-content/uploads/2019/04/87-Geo.-Wash.-L.-Rev.-468.pdf (last visited Oct 9, 2025).

having been formed in Panama City, Panama, no public job postings, no public disclosure of their offices, no public disclosure of their business partners, no public disclosure of their board or leadership—does not mean it bears a legitimate connection to the tribe.

64.    A purported tribal entity must show it is an arm of the tribe to avail itself of sovereign immunity protection.

65.    Courts generally utilize the "arm-of-the-tribe" multifactor test to determine whether a subordinate entity is entitled to share in the Tribe's sovereign immunity. The relevant factors include "(1) their method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1181 (10th Cir. 2010).

66.    More succinctly, "[a] TLE is likely to be classified as an arm-of-the-tribe when it is sufficiently controlled by the tribe under which it is chartered and when the economic benefits of the lending enterprise are primarily kept within the tribe." *Glass*, Tribal Lending 23 N.C. BANKING INST. at 413.

67.    The Tribe does not meaningfully participate in the day-to-day lending operations of Credit Cube. Rather, the Defendants, including other unnamed individuals to be identified in discovery, exercise control of the illegal lending enterprise by operating all substantive aspects of the business, including the funding, marketing, origination, underwriting, servicing, electronic funds transfers, and collections of illegal loans.[8]

---

[8] Plaintiff's Counsel identified multiple employees of Credit Cube in positions off site of tribal

68.     These "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions are performed far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.[9]

69.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes, and, therefore, are not shielded by sovereign immunity.

70.     At best, sovereign immunity for an "arm of the tribe" creates a defense to criminal and civil prosecution, but it does not turn an unlawful loan into a legal one. *See, e.g., United States* v. Neff, 787 Fed. Appx. 81, 89 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; "reasonable people would know that collecting unlawful debt is unlawful"). "[T]he burden of proof should fall to the entity seeking immunity as an arm of the tribe, despite the jurisdictional nature of such immunity." *Easley v. Hummingbird Funds*, No. 19-cv-00937, 2020 WL 5099955, at *4 (S.D. Ala. July 30, 2020) (citing *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019)).

71.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. *United States v. Tucker, et al.,* No. 1:16-cr-00091-PKC (S.D.N.Y.) (defendants convicted on 14 felony counts for operation of a network of tribal lending companies).

---

lands in other States.

[9]  *See Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021)

72.     Credit Cube currently operated under a lending license issued on May 17, 2023, by the Big Valley Band of Pomo Indians Consumer Financial Services Regulatory Authority.

73.     Beyond such performative acts, the connections between Credit Cube and the Tribe are highly attenuated.

74.     Despite claiming it is "owned and operated" by the Tribe, Credit Cube was created in Panama City, Panama, and its legal address is P.O. Box 133, Finley, California 95435, a UPS mailbox located off tribal land.

75.     Tellingly, the Tribe's official website does not mention Credit Cube Loans at all.[10]

76.     Upon information and belief, virtually none of Credit Cube's business is conducted on the Tribe's reservation.

77.     Business operations conducted off tribal reservation land are conducted by and for non-tribal investors and interested parties.

78.     The Tribe has engaged in similar "rent-a-tribe" schemes before. In the class action complaint from *Hall*, a case against Layama, LLC d/b/a Little Lake Lending, plaintiffs alleged the Tribe had almost no involvement in the loans and received "a fraction" of the revenues. Complaint, *Hall et al v. Layma, LLC, et al*, No. 1:23-CV-00929, DE 1 (N.D. Ill. Feb. 15, 2023).

79.     The complaint also alleged that a dozen other lenders have used the address of Layama LLC—a 1,200-square-foot building—on the same street as the address listed for Credit Cube. *Id.*

80.     To further advance the pretense of tribal initiative and control and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically

---

[10] Tribal Enterprises, *available at* https://www.bvrancheria.com/businesses (last visited Oct. 2, 2025)

employed to keep the focus on the tribes and deter consumers from enforcing their rights. Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, to create the pretense of a legal infrastructure independent from state and federal law.

**E.     Credit Cube's Unenforceable Choice-of-Law, Arbitration, and Class Action Waiver Provisions**

81.     Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving unlawful and usurious loans.

82.     The loan agreements are typically structured to include a waiver of all state and federal rights, in favor of tribal law and dispute resolution provision. That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

83.     To start the loan application process, an applicant must agree to Credit Cube's Loan Agreement.

84.     Credit Cube's Loan Agreement contains several unconscionable and unenforceable choice-of-law and forum-selection provisions—designed to circumvent consumer protection laws and prevent customers from aggregating disputes—that violate public policy.

85.     The arbitration agreement in Credit Cube's Loan Agreement states, "The arbitrator shall apply Tribal Law, applicable federal law, and the terms of this Agreement, including this Agreement to Arbitrate and the waivers included herein." **<u>Exhibit A</u>**.

86.     Credit Cube attempts to avoid all state usury laws with these term provisions, and the arbitration agreement is therefore unenforceable.[11]

---

[11] Numerous courts concluded the arbitration agreement unenforceable. E.g., *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was

87.     Moreover, Credit Cube's Loan Agreement includes a "Waiver of Class Actions, Representatvie [sic] actions, and Jury Trial," which is unenforceable and contravenes public policy. **Exhibit A**.

88.     Upon information and belief, the Loan Agreements all putative Class Members were required to execute were substantively identical and included the same unlawful prospective waiver of the Class Members' state and federal rights.

### CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action on behalf of himself and all other persons similarly situated (the "Class").

90.     Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All individuals identified as North Carolina residents in Credit Cube Loan agreements where the last installment became due and payable within four years before the filing of this Complaint.

91.     The requirements for maintaining this action as a class action are satisfied.

92.     **Numerosity.** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of the Class members is unknown to Plaintiff at this time, upon information and belief, there are likely hundreds of members of the proposed Class.

---

solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens,* 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.,* 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin., LLC,* 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc.,* No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.,* 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.,* 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.,* 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

93.     The number of Class members is known by Credit Cube, and thus Class members may be notified of the pendency of this action by first class mail, electronic mail, or published notice.

94.     **Commonality.** Questions of law and fact common to the Class predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.      Whether Credit Cube issued loans with per annum interest rates exceeding those allowed by North Carolina usury law;

b.      Whether Credit Cube issued loans with per annum interest rates exceeding twice the enforceable rate;

c.      Whether Credit Cube was licensed lenders under North Carolina law;

d.      Whether Credit Cube's conduct was knowing or willful;

e.      Whether Credit Cube engaged in unfair and deceptive practices while conducting their lending businesses;

f.      Whether all Defendants conspired together in an unlawful enterprise designed to collect unlawful debts;

g.      Whether the Tribe is being used as a front by non-tribal actors to create the appearance of tribal immunity;

h.      Whether the arbitration clause and class action waiver in Credit Cube's terms of service are valid and enforceable;

i.      Whether Class Members are entitled to declaratory and injunctive relief;

j.      Whether Class Members suffered legally cognizable damages as a result of Credit Cube's unlawful conduct;

k.      Whether Class Members are entitled to treble damages, civil penalties, or punitive damages.

95. **Typicality.** Plaintiff's claims are typical of those of other Class members in that Credit Cube deceived and took advantage of Plaintiff in the very same manner that it did each of the other Class members. Plaintiff's interests are consistent with those of the other Class members.

96. **Adequacy of the Representation.** Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel are competent and experienced in litigating class actions.

97. **Predominance.** Credit Cube engaged in a common course of conduct toward Plaintiff and Class Members. The common issues arising from Credit Cube's conduct affecting Class Members, as described above, predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages for judicial economy.

98. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Credit Cube.

99. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

100.     Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class wide basis.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of North Carolina Usury Law
### (N.C.G.S. § 24-1 *et seq.*)

101.     Plaintiff restates the allegations in paragraphs 1-100 as if set forth at length herein.

102.     Pursuant to N.C. Gen. Stat. § 24-1.1, the legal interest rate chargeable to consumers is 8%.

103.     In North Carolina a loan with a principal amount of less than $25,000 allows the maximum interest rate to be the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6% rounded to nearest half percent, or (2) 16%." N.C. Gen. Stat. § 24-1.1(c).

104.     Charging consumers more than the maximum interest rate—regardless of whether the interest rate has been paid or not—results in a forfeiture of the entire interest. N.C.G.S. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

105.     Credit Cube entered into loan agreements with Mr. Armstrong and members of the Class with an understanding that the money owed would be paid, and interest would be charged at a rate greater than allowed by North Carolina usury law. As set forth more fully above and incorporated by reference herein, Credit Cube made loans to Plaintiff and Class Members featuring interest in excess of 16%, in violation of N.C. Gen. Stat. § 24-1.1.

106.     Defendants' website makes plain that the APR for any loan will be between 259.94% and 779.97%. Credit Cube, *Rates and Terms*, https://creditcube.com/rates-and-terms, last accessed Sep. 25, 2025. Thus, every loan made by Defendants violates North Carolina usury law.

107.    By intentionally charging more for money lent than allowed by North Carolina law, Credit Cube demonstrated a corrupt intent to receive more in interest than the rate permitted by North Carolina law.

108.    Ben G. Ray III aided and abetted Credit Cube's violations of North Carolina usury law by providing a pseudo-tribal connection between the Tribe and Credit Cube to create the appearance of sovereign immunity to North Carolina usury laws.

109.    Other unknown individuals aided and abetted Credit Cube's violations of North Carolina usury law in ways that will be shown through discovery.

110.    North American Banking Company aided and abetted Credit Cube's violations of North Carolina's usury law by providing access to the ACH Network to carry out Credit Cube's illegal scheme and by originating debit entries on behalf of Credit Cube.

111.    In providing access to the ACH Network to carry out Credit Cube's illegal scheme, North American Banking Company knowingly provided substantial assistance to—and profited from—Credit Cube's illegal lending activities.

112.    At the time North American Banking Company provided access to the ACH Network to carry out Credit Cube's illegal scheme, they knew the identity of Credit Cube, including its unlawful activity.

113.    North American Banking Company was aware of the illegal nature of Credit Cube's lending activities through due diligence procedures and prior lawsuits.

114.    Because North American Banking Company knowingly participated in the making of illegal loans, it is liable as an aider and abettor of the violations of the North Carolina usury law described herein.

115.    As a result of all Defendants' conduct, Mr. Armstrong and Class Members were harmed.

116.    Mr. Armstrong and Class Members are entitled to repayment of twice the amount of interest paid on unlawful loans, forgiveness of purported debt, and return of the unencumbered title of their property pursuant to North Carolina usury Law, N.C. Gen .Stat. § 24-2.

## COUNT II
## Violation of the North Carolina Consumer Finance Act (CFA)
## (N.C.G.S. § 53-166)

117.    Plaintiff restates the allegations in paragraphs 1-100 as if set forth at length herein.

118.    Credit Cube is a "person" as defined by the CFA. N.C. Gen. Stat. § 53-165(10).

119.    Ben G. Ray III is a "person" as defined by the CFA. N.C. Gen. Stat. § 53-165(10).

120.    North American Banking is a "person" as defined by the CFA. N.C. Gen. Stat. § 53-165(10).

121.    Other unnamed defendants are each a "person" as defined by the CFA. N.C. Gen. Stat. § 53-165(10).

122.    The CFA prohibits a person from engaging in the "business of lending or servicing a loan in an amount of twenty-five thousand dollars ($25,000) or less" and seeking to "contract for, exact, or receive, directly or indirectly, on or in connection with the loan, any charges whether for interest, compensation, consideration, or expense, or any other purpose whatsoever, that in the aggregate are greater than [16%]," unless the person is licensed under the CFA or is exempt from the CFA's licensing requirement. N.C. Gen. Stat. § 53-166(a) (establishing licensing requirement); N.C. Gen. Stat. § 24-1.1(a)(1), (c) (establishing 16% rate cap).

123.    The CFA prohibits persons from avoiding its licensing requirement through "any device, subterfuge, or pretense whatsoever." N.C. Gen. Stat. § 53-166(b).

124. Based on Mr. Armstrong's $400.00 loan amount, his "finance charge" of $780.43, and his annual percentage rate of interest of 755.68%, are well over the 16% allowed under North Carolina law for an unlicensed lender.

125. Credit Cube is not a licensed lender in North Carolina under the CFA. The disclosures in Mr. Armstrong's Loan agreement even suggested, "[i]f you wish to have your resident state law apply to any loan that you take out, you should consider taking a loan from a licensed lender in your state." **Exhibit A**.

126. Therefore, all loans made by Credit Cube in North Carolina violated the CFA.

127. Plaintiff respectfully requests a declaration that Mr. Armstrong's Loan, and all loans made to Class Members, are void and unenforceable.

128. Such a rate, and Credit Cube's intent to bypass state licensure protections against this type of transaction, violates the CFA.

129. Mr. Armstrong and Class Members suffered injury as a result of all Defendants' violation of the CFA.

130. Accordingly, Mr. Armstrong and Class Members are entitled to any principal or charges whatsoever with respect to the loan, pursuant to Section 53-166(d) of the CFA, N.C. Gen. Stat. § 53-166.

## **COUNT III**
## **Violation of North Carolina's Unfair or Deceptive Trade Practices Act (NCUDTPA)**
## **(N.C.G.S. § 75-1.1, _et seq._)**

131. Plaintiff restates the allegations in paragraphs 1-100 as if set forth at length herein.

132. Under the NCUDTPA, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a).

133. Credit Cube's practices constitute violations of N.C. Gen. Stat. § 75-1.1 in that such actions were against the established public policy of the State of North Carolina, were in or affecting commerce in North Carolina, and were unfair, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and Class Members.

134. Credit Cube's loan agreements lock vulnerable consumers in need of money into usurious rates while forcing them to disclaim all protections afforded by applicable state laws.

135. Further, Credit Cube's unenforceable arbitration agreement which disclaims state law protections is tied to a class-action waiver that violates North Carolina public policy.

136. North American Banking facilitates the ACH payments and withdrawals that allow Credit Cube to make their unfair, unethical, oppressive, unscrupulous, and substantially injurious loan agreements and receive payments on those agreements.

137. Ben G. Ray III provides the pseudo-tribal connection that creates the appearance of sovereign immunity against State laws that allows Credit Cube to continue making substantially injurious loan agreements.

138. The full extent of the roles other unnamed individuals played in Credit Cube's NCUDTPA violations will be revealed through discovery.

139. Mr. Armstrong's Loan tied him to these unfair and deceptive practices in exchange for $400. To pay off his loan, he made payments totaling $1,180.43 over four months. **Exhibit A**.

140. Class Members suffered under similar loan agreements, which they entered into in reliance upon Credit Cube's representations regarding the purported legality of the loans.

141. As a direct and proximate result of all Defendants' violations of the NCUDTPA, Plaintiff and Class Members have been injured and are entitled to an award of monetary damages.

142.     Under the NCUDTPA, Plaintiff and Class Members are entitled to recover treble damages as well as attorneys' fees and costs. N.C. Gen. Stat. § 75-16.

<u>**COUNT** IV</u>
<u>**Violations of the Racketeer Influenced and Corrupt Organization (RICO) Act**</u>
<u>**(18 U.S.C. § 1962(c))**</u>

143.     Plaintiff restates the allegations in paragraphs 1-100 as if set forth at length herein.

144.     Credit Cube and North American Banking are corporate entities and are each a "person" as defined by 18 U.S.C. § 1961(3); therefore, they are within the scope of 18 U.S.C. § 1962(c).

145.     Ben G. Ray III is a person as defined by 18 U.S.C. § 1961(3), and therefore is within the scope of 18 U.S.C. § 1962(c).

146.     Other unnamed individuals are unknown non-tribal actors that were involved with the making, distribution, and collection of the unlawful and usurious loans. They, as either corporate entities or individuals, are "persons" as defined by 18 U.S.C. § 1961(3) and are therefore within the scope of 18 U.S.C. § 1962(c).

147.     Credit Cube, North American Banking, Ben G. Ray III, and other unnamed individuals form an "enterprise" as defined by 18 U.S.C. § 1961(4) because they are a "group of individuals associated in fact."

148.     An "unlawful debt" is a debt "incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

149.     All Defendants acting individually and in concert violated section 1962(c) of the RICO Act by participating, directly or indirectly, in the conduct of the enterprise's affairs in the collection of unlawful debt at a rate that is more than twice the rate allowed in North Carolina.

150.     It is unlawful, pursuant to section 1962(c) of the RICO Act, for any person employed or associated with an enterprise engaged in activities affecting interstate commerce to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt." 18 U.S.C. § 1962(c).

151.     North American Banking offers ACH services for various tribal Lenders including Credit Cube. In return, the Tribe provides minimal customer-support resources and most importantly, the inaccurate perception of tribal immunity.

152.     Ben G. Ray III facilitates the perception of tribal immunity by his participation in the scheme as a pseudo-executive.

153.     The full extent of the roles other unnamed individuals played in Credit Cube's NCUDTPA violations will be revealed through discovery.

154.     The persons and entities associated with this "rent-a-tribe" scheme work toward a common goal of issuing usurious loans that unfairly prey on residents of North Carolina and violate State law.

155.     The usurious lending scheme engages in and affects interstate commerce. It results in North Carolina consumers being lured into predatory loans with interest rates that far exceed twice the prohibited rate in North Carolina. The enterprise exists for the purpose of collecting unlawful debts.

156.     Plaintiffs and Class Members were injured as a direct result of all Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to Credit Cube, which money transfers would not have been made but for North American Banking's conduct.

157.    Accordingly, all Defendants are jointly and severally liable in their individual capacities to Plaintiff and Class Members for their actual damages, treble damages, costs, and attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

<u>**COUNT** V</u>
<u>**Violations of the Racketeer Influenced and Corrupt Organization (RICO) Act**</u>
<u>**(18 U.S.C. § 1962(d))**</u>

158.    Plaintiff restates the allegations in paragraphs 1-100 as if set forth at length herein.

159.    All Defendants violated section 1962(d) of RICO by conspiring to violate § 1962(c).

160.    All Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under State usury laws.

161.    All Defendants have been put on notice of the scheme's illegality. *E.g., Fed. Trade Comm'n v. Lead Express, Inc.*, No. 220CV00840JADNJK, 2021 WL 4173922, at *10 (D. Nev. Sep. 13, 2021); *Parm et al. v. BMO Harris Bank., N.A. North American Banking Company, et al.,* 1:13-cv-03326 (N.D. Ga. 2013); and *Harris et al v. Credit Cube et al*; No. 1:23-CV-01153 (N.D. Ill. 2023).

162.    Plaintiff and Class Members were injured as a result of all Defendants' violation of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

163.    Accordingly, all Defendants are jointly and severally liable in their individual capacities to Plaintiff and Class Members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and Class Members asks the Court to enter a judgment awarding the following relief:

A.     That this action be certified as a class action, establishing the Class and any subclasses the Court may deem appropriate;

B.     That Plaintiff and his Counsel be appointed to represent the Class;

C.     That this Court award Plaintiff and Class Members actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

D.     That this court provide declaratory, injunctive, and other equitable relief as permitted by law, including enjoining all Defendants from continuing the unlawful practices described in this Complaint;

E.     That this Court award punitive damages, as allowable by law;

F.     That this Court award attorneys' fees and costs, as allowable by law;

G.     That this Court assess pre- and post-judgment interest on any amounts awarded; and

H.     That this Court provide such other and further relief as may be deemed just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: October 9, 2025.

Respectfully submitted,

**BRYSON HARRIS**
**SUCIU & DEMAY, PLLC**

/s/ *Scott C. Harris*
Scott C. Harris
NC Bar No.: 35328
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
sharris@brysonpllc.com

**MILLER LAW GROUP, PLLC**

W. Stacy Miller
NC. State Bar No. 21198
MaryAnne M. Hamilton
NC. State Bar No. 59323
2424 Glenwood Ave, Suite 201
Raleigh, NC 27608
Telephone: 919-348-4361
stacy@millerlawgroupnc.com
maryanne@millerlawgroupnc.com

*Attorneys for Plaintiff and Putative Class*